# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF PENNSYLVANIA
# (HARRISBURG)

| | |
|---|---|
| In re<br><br>CLASSIC COMMUNITIES CORP.,<br><br>Debtor. | Case No. 16-02022-RNO<br><br>Chapter 11 |

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY FOR THE COMMITTEE TO COMMENCE AND PROSECUTE CERTAIN ACTIONS ON BEHALF OF THE ESTATE

The Official Committee of Unsecured Creditors of Classic Communities Corporation, (the "**Committee**"), by and through its undersigned counsel and pursuant to Sections 105(a), 547, 548, 549, 550, 551, 1103 and 1109 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), hereby moves for entry of an Order authorizing the Committee to commence and prosecute fraudulent transfers, preferences, postpetition transfers, breach of fiduciary duty, improper distributions, and certain other claims on behalf of the estate against the principals, insiders and affiliates of Classic Communities Corp. (the "**Debtor**" or "**Classic**"), and certain other non-debtors, which the Debtor has unjustifiably failed and refused to prosecute.[1] In support of this Motion, the Committee states as follows:

### PRELIMINARY STATEMENT[2]

1. Classic was founded by Virginia Halbert over 25 years ago to develop real estate and build homes in the Harrisburg, Pennsylvania metropolitan area. At the height of its success,

---

[1] If the Court grants the Committee standing to pursue causes of action on behalf of the estate, the Committee intends to file an adversary complaint substantially in the form attached hereto as **Exhibit A.**

[2] Capitalized terms not defined in this Preliminary Statement have the meaning ascribed to them in the sections below.

Classic was one of the largest homebuilders in south-central Pennsylvania, developing and building over 20 communities, and generating revenues in excess of $60 million annually. After many successful years under Virginia Halbert, she gifted the stock of Classic to her sons, James "**Jim**" Halbert and Douglas "**Doug**" Halbert, and eventually ceded took control to them of the day to day management of Classic's operations.

2. Jim (an attorney) and Doug (a doctor) had no prior experience managing real estate development or homebuilding companies when they took over control of Classic, and neither had a background in accounting. Jim's wife, Julie Beth Wright Halbert ("**Julie**"), also an attorney, became deeply involved in the day to day operations of Classic as well. Jim, Doug and Julie (together, the "**Halberts**") formed at least three (3) dozen affiliated entities in Pennsylvania to expand the enterprise and orchestrate the scheme which ultimately caused the Debtor's downfall. Variations of Jim, Doug and/or Julie directly or indirectly own and operate the numerous affiliates (collectively, the "**Affiliates**").

3. By 2014, the family business turned from a successful company to one that was insolvent and could not pay its debts as they came due. Classic's net operating losses were caused in large part by the Halberts' self-dealing and improper actions which (i) systematically transferred millions of dollars in real estate assets to third-parties for no consideration or less than reasonably equivalent value, (ii) stripped valuable assets out of Classic for the Halberts' own personal gain, and (iii) disrespected corporate separateness and intercompany obligations, all to the detriment of Classic and its numerous unsecured creditors. Their actions culminated in the wholesale transfer of the Debtor's remaining valuable assets to a newly formed entity, for almost no consideration, that the Halberts brazenly created for their future – Legacy Homes of Central Pennsylvania, LLC ("**Legacy**"). The transactions in question left nearly $30 million of intercompany payables from the Debtor's Affiliates unpaid, provided millions of dollars in

2
55468/0001-14553969v2

Case 1:16-bk-02022-RNO    Doc 737    Filed 07/19/17    Entered 07/19/17 17:14:43    Desc
Main Document    Page 2 of 16

windfalls to the Halberts and their friends and family, subsidized the Halberts' life of luxury, and plunged the Debtor into bankruptcy.

4. The Committee represents creditors holding claims in excess of $15 million against the Debtor in this case. Since its formation, the Committee has undertaken an exhaustive investigation into the Debtor's transactions, and as a result, it is plainly apparent that the Debtor's estate has valid causes of action which the Committee is prepared to prosecute on behalf of the estate. The Committee seeks authority to bring the Complaint to preserve the rights and interests of the Debtor's unsecured creditors in the face of the systematic scheme by the principals, insiders, and affiliates to intentionally, or constructively, defraud the estate. If the Committee is successful, the recoveries for the general unsecured creditors could be in the millions. If the actions are not prosecuted, the unsecured creditors will likely get nothing.

5. The Halberts, who still operate the Debtor as a debtor-in-possession, will not prosecute the estate's substantial claims against themselves and their circle of friends and companies, and their refusal, while not surprising, is legally unjustifiable. Accordingly, the Committee requests entry of an order authorizing it to pursue the claims, all as set forth more fully in the Complaint, pursuant to 11 U.S.C. §§ 105, 541, 544, 547, 548, 549, 550 and 551 of title 11 of the Bankruptcy Code and §§ 5104(A)(1), 5014(A)(2), 5201, 5107 and 5108 of Pennsylvania's Uniform Fraudulent Transfer Act. As discussed below, the legal requirements for granting the Committee derivative standing to pursue the claims have been satisfied.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

7. The statutory predicates for the relief sought herein are sections 105(a), 107(b), and 1102(b)(3)(A) of the Bankruptcy Code. Relief is also warranted under Federal Rule of Bankruptcy Procedure 9018.

## BACKGROUND

**A. The Bankruptcy Case**

8. On the May 10, 2016 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

9. The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code while it liquidates its remaining assets.

10. No trustee or examiner has been appointed in this Chapter 11 case.

11. On June 7, 2016, the Committee was appointed in this case by the Office of the United States Trustee (the "**U.S. Trustee**"). The U.S. Trustee formed a seven (7) member Committee consisting of the following members: (a) Adams Drywall, Inc.; (b) Benfield Electric Co., Inc.; (c) Esh's Masonry, LLC; (d) James Lauer f/d/b/a Lauer Electric; (e) J.C. Snavely & Sons, Inc.; (f) Mountain View Plumbing & Heating; and (g) Schouten Drywall LLC.

**B. The Avoidance Actions**

12. Since its appointment, the Committee undertook a thorough review into potential causes of action held by the Debtor's estate.

13. By letters dated June 15, 2016 and July 18, 2016, the Committee initially requested documents from the Debtor regarding insider transfers. Since that time, the Committee sent dozens of emails requesting the production of all of the documents sought in the letters, and certain additional documentation.

14. As part of its investigation, the Committee subsequently sought and obtained Orders granting seven motions seeking authority to conduct examinations of the Debtor, Jim, Doug, Dr. Jay and Alyson Goodman, Beverly Magdule and Craig Adler, Esquire, and obtain documents under Fed.R.Bankr.P. 2004 (Dkt. Nos. 431, 434, 436, 438, 440, 442, 446).

15. Attempting to obfuscate the facts and circumstances underlying their egregious conduct, the Debtor and the Halberts withheld and/or redacted hundreds if not thousands of critical communications and documents that included Julie bearing directly on the estate's claims, under the guise of the attorney-client privilege.

16. Jim and the Debtor were examined under oath pursuant to Rule 2004 on January 18, 2017. A review of the transcript of Jim's examination and the documents produced by the Debtor, indicate that the Halberts, various insiders, and certain third parties, received substantial prepetition transfers sufficient to assert colorable claims against them for fraudulent (and/or preferential) transfers under §§ 547 and 548. The transfers include, but are not limited to, the following:

- The Debtor's failure to collect approximately $30 million for contractual design, development and/or construction services which the Debtor provided to the Halbert-owned Affiliates, and/or the Affiliates' use of the Debtor's credit facilities without repayment;

- The Halberts creation of Legacy, a new entity which the Debtor and Halberts transferred Classic's personal property, certain real estate, IP, employees, and profitable construction contracts to for almost no consideration and certainly less than reasonably equivalent value, in an attempt to leave Classic saddled with the debt and start fresh with a new home building company;

- The Debtor's sale of numerous homes and rental units with substantial seller discounts ranging from 15% and 30% off the appraised value of the homes, to their dear friends Dr. Jay and Alyson Goodman, their Controller Bev Magdule and her husband Stuart Magdule, Esquire, and Jim and Doug's business partner Stuart Knickerbocker, in a desperate attempt to get availability under their credit lines;

5

55468/0001-14553969v2

Case 1:16-bk-02022-RNO    Doc 737    Filed 07/19/17    Entered 07/19/17 17:14:43    Desc
Main Document    Page 5 of 16

- The Debtor's payment of salaries for the employees of non-debtor Halbert-owned Affiliates;

- The Debtor's transfer of rental units to certain trade creditors with values and revenue streams far in excess of the creditor's claims against the Debtor to entice such trade creditors to work for the Halberts' new home building company - Legacy;

- The Debtor's funding of expenses for the Halberts' family vacation homes in Marco Island, Florida and Stone Harbor, NJ;

- The Debtor's transfer of its most valuable rental units to a newly formed Halbert-owned entity called SVR One LP for less than reasonably equivalent value to preserve the assets for what Julie referred to as their "retirement," and the subsequent transfer of the ownership interests of SVR One LP to Julie's parents, Stanley and Cynthia Wright (the "**Wrights**"), in an undocumented transaction that was not disclosed by SVR One LP in its 2015 tax returns; and

- The Debtor's granting of liens on its Presbyterian Farm real property to the Wrights, despite the fact that the Wrights never loaned money directly to the Debtor, and the Debtor never agreed to provide the Wrights with a security interest in any agreement.

17. Insiders including Jim, Doug, Julie, Virginia, the Wrights, the Wright Family Trust, and partnerships which the Debtor and its insiders may hold interests, are recipients of fraudulent transfers from the Debtor under applicable bankruptcy law and Pennsylvania state law.

C. **The Committee's Demand for Information**

18. Since its formation, the Committee made several requests to the Debtor to produce its analyses of the estate's avoidance actions, as well as all relevant documents needed to evaluate such actions. While the Debtor produced numerous documents in the case, it failed to provide any analyses of avoidance actions whatsoever, presumably because it has not undertaken the analyses, and it held back critical documents regarding insider transactions.

19. Contemporaneous with the filing of this motion, the Committee is filing a *Motion to Compel Production of Communications and Documents, or in the Alternative, for In Camera*

*Review*, seeking an Order requiring the production of hundreds, if not thousands, of critical communications and documents that included Julie, bearing directly on the estate's claims. Julie is also a principal of several affiliated entities which the Committee believes received fraudulently transferred real property and money. The Debtor withheld and/or redacted documents under the guise of the attorney-client privilege, despite the fact that many, if not all, of her emails to the Debtor did not provide legal advice or pertain to legal matters whatsoever, and even if they did, the crime-fraud exception to the privilege allows for the production because the communications and documents were in furtherance of the Debtor's unlawful scheme to fraudulently transfer millions of dollars and assets. The Debtor even failed and refused to provide a privilege log containing a basis for holding back the documents as required under the Federal Rules.

20. Prior to filing this Motion, the Committee made a written demand on the Debtor, on or about January 25, 2017, to file the subject avoidance actions and claims before February 7, 2017 (the "**Demand Letter**"). A copy of the Demand Letter is attached hereto as **Exhibit B**. In response, the Debtor's counsel advised the Committee by letter dated January 27, 2017 that

(a) by February 14, 2017, the Debtor "will have had an opportunity to do an analysis as to [your] alleged claim as to fraudulent conveyances . . . "; and

(b) "In order to assist us in making an analysis as to whether the Debtor should bring a fraudulent conveyance action, I need specific details. Without such details, it is impossible to do a proper analysis as to whether or not there is any validity to the claim of fraudulent conveyances and, thus, the Debtor cannot make an informed decision. It is important to know each claim the Creditor's Committee believes is actionable so that none are missed or overlooked. The Debtor would bring a fraudulent conveyance action if specificity could be provided and the facts warrant same."

A copy of the Debtor's response is attached hereto as **Exhibit C**. The Debtor's response is indicative of the age-old "fox guarding the henhouse" paradox in Chapter 11 cases, as it feigns

ignorance to avoid bringing claims that would amount to reputational self-immolation. See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573-74 (3d Cir. 2003).

21. Despite the fact that the Debtor and the Halberts owe a duty to investigate avoidance actions, even if they are against themselves, the Committee, through its counsel, sent the Debtor's counsel an email dated February 9, 2017 to respond to counsel's request, and detailed twelve (12) different fraudulent transfer schemes which the Committee contends the Debtor orchestrated over the 4 years prior to the Petition Date, totaling in excess of $35 million. The Committee also sent to counsel for the Debtor's principals and certain insiders (copying Debtor's counsel) emails on April 16, 19, 21, 22, 2017 and May 19, 2017, providing additional details about the numerous causes of action, and Committee counsel travelled from Baltimore to Philadelphia to meet with the Halberts' personal counsel and Jim to discuss the claims. Each time, the Debtor and the Halberts unjustifiably refused to take action.

22. Accordingly, the Complaint the Committee seeks to file, which again sets forth the numerous claims in detail, is attached hereto as **Exhibit A** (the "**Complaint**").

## BASIS FOR RELIEF

23. The Debtor's prepetition and postpetition transfers, which satisfy the elements of §§ 547, 548, 549 and/or 550, constitute fraudulent, preferential and/or otherwise avoidable transfers and should be avoided. Because these avoidance claims represent valuable assets of the Debtor's estate, and (a) the Debtor has unjustifiably failed and refused to assert the claims which the Committee believes are meritorious and valuable, (b) if not asserted, the estate stands to lose valuable assets as the real estate is sold to good faith purchasers and/or liened by other creditors,

and cash is depleted by the Halberts and Affiliates[3], and (c) as set forth below, the prerequisites for derivative standing followed by the Third Circuit Courts of Appeal are satisfied, the Committee seeks the requested relief to fulfill its fiduciary responsibilities, as mandated by §§ 1103(c) and 1109 of the Bankruptcy Code.

**A.     Standard for Derivative Standing**

24.     The practice of conferring standing upon a creditors' committee to pursue actions on behalf of a bankruptcy estate is widely followed and accepted in the Third Circuit and elsewhere. See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 575 (3d Cir. 2003); In re Washington Mutual Inc., 461 B.R. 200, 254 (Bankr. D. Del. 2011); In re G-I Holdings Inc., 313 B.R. 612, 628 (Bankr. D.N.J. 2004); Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.), 316 B.R. 141, 145 (Bankr. D. Del. 2004); see also In re Adelphia Communications Corp., 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) ("[t]he practice of authorizing the prosecution of actions on behalf of an estate by committees … upon a showing that such is in the interests of the estate, is one of long standing, and nearly universally recognized."); In re La. World Exposition, Inc., 858 F.2d 233, 247 (5th Cir. 1988) (finding that "[t]he law is well-settled that in some circumstances, a creditors' committee has standing under Title 11, United States Code, section 1103(c)(5) and/or section 1109(b) to file suit on behalf of a debtor-in-possession or a trustee"); Unsecured Creditors Comm. v. Noyes (In re STN Enters.), 779 F.2d 901, 904 (2d Cir. 1985) (agreeing with those bankruptcy courts that have held that Sections 1103(c)(5) and 1109(b) imply a qualified right for creditors' committees to initiate litigation with the approval of the bankruptcy court); Liberty Mut. Ins. Co. v. Official Unsecured Creditors Comm. (In re Spaulding Composites Co., Inc.), 207 B.R. 899, 903 (B.A.P. 9th Cir.

---

[3] Upon information and belief, in or around the 4th quarter of 2016 or 1st quarter of 2017, the Halberts even granted "advance" liens to their personal counsel hired to defend against the avoidance action claims, on real estate which they were previously notified by the Committee to be a target of the fraudulent transfer claims.

9

1997) (finding that "[i]t is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation."); In re iPCS, Inc., 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead."); Official Comm. of Unsecured Creditors of Joyanna Holitogs, Inc. (In re Joyanna Holitogs, Inc.), 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that general right to be heard would be an empty grant unless those who have such a right are also given the right to do something where the debtors will not).

25. Indeed, committees have "an implied, but qualified, right … to initiate adversary proceedings in the name of the debtor-in-possession under 11 U.S.C. §§ 1103(c)(5) and 1109(b)." In re STN Enters., 779 F.2d at 904; see also Cybergenics, 330 F.3d at 568 (a bankruptcy court may, in appropriate circumstances, utilize its equitable powers to authorize derivative standing). As the Third Circuit has explained, the statutory language of the Bankruptcy Code suggests that:

> Congress intended for creditors' committees to perform services on behalf of the estate, and that Congress consciously built a measure of flexibility into the scope of those services. As the question before us today is whether a bankruptcy court can authorize a creditors' committee to represent the estate when the usual representative is delinquent, the "flexible representation" role evidenced in § 1103(c)(5) militates in the affirmative.

Cybergenics, 330 F.3d at 563.

26. Generally, in determining the appropriateness of derivative standing, the Court should determine the following: (a) whether a colorable claim exists that would affect distributions to unsecured creditors; (b) whether the debtor has unjustifiably refused to bring the claim itself; and (c) whether the committee sought permission from the bankruptcy court to

10

initiate the action. See In re Yes! Entm't Corp., 316 B.R. at 145 (citations omitted); Fogel v. Zell, 221 F.3d 955, 965 (7th Cir. 2000); In re Gibson Group, Inc., 66 F.3d at 1438; La. World Exposition, 858 F.2d at 247; In re STN Enters., 779 F.2d at 904-05. As set forth below, all requirements for derivative standing have been met here.

**B.     The Claims Here Are Plainly Colorable**

27.     To establish that the claims to be asserted are colorable, the Committee must demonstrate that the pursuit of such claims is reasonably expected to produce an actual benefit for the estate. See In re Yes! Entm't Corp., 316 B.R. at 145 (allowing committee to pursue claims after finding that they might "yield substantial recovery to the estate"). In determining whether a claim is colorable, the Court is not required to conduct a mini-trial. See In re STN Enters., 779 F.2d at 905 (citation omitted). Rather, the Court may "weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis" to determine whether the prosecution of claims is likely to benefit the estate. In re iPCS, Inc., 297 B.R. at 291 (internal quotation and citation omitted). Thus, there are two aspects of the colorability analysis. First, the Court considers the colorability of the proposed claims on the merits. Second, the Court undertakes a cost-benefit analysis in determining whether the litigation should proceed.

28.     The requirement to establish that "colorable" claims exist is a relatively low burden. See, e.g., In re Adelphia, 330 B.R. at 369 (noting that the court need only be satisfied that there is "some factual support" for the claims); Official Comm. of Unsecured Creditors of Correll Steel ex rel. Correll Steel v. Fishbein & Co., P.C., Civ. A. No. 91-4919, 1992 WL 196768, at *2 n.3 (E.D. Pa. Aug. 10, 1992) (creditors' committee seeking to prosecute estate causes of action need only demonstrate that its proposed claims are "potentially meritorious"); In

11

55468/0001-14553969v2

Case 1:16-bk-02022-RNO    Doc 737    Filed 07/19/17    Entered 07/19/17 17:14:43    Desc
Main Document    Page 11 of 16

re Racing Services, Inc., 540 F.3d 892, 900 (8th Cir. 2008) (noting that "a creditor's claims are colorable if they would survive a motion to dismiss").

29.     In determining whether a claim is "colorable," courts consider whether a creditors' committee has asserted claims for relief that would, upon bringing forth appropriate proof, support recovery. See In re iPCS, Inc., 297 B.R. at 291 (citations omitted). The inquiry is analogous to a defendant's motion to dismiss a complaint, as a creditors' committee is not required to present its proof when seeking derivative standing. See id. (citing In re America's Hobby Center, Inc., 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); In re KDI Holdings, Inc., 277 B.R. 493 (Bankr. S.D.N.Y. 1999); In re Valley Park, Inc., 217 B.R. 864, 869 n. 4 (Bankr. D. Mont. 1998) (a committee "does not have to satisfy the quantum of proof necessary for a judgment in order to show a colorable claim")). Thus, the court should, like with a motion to dismiss, not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 292 (internal quotation and citation omitted). While the court need not accept conclusions of law asserted in the complaint as true, "the complaint must be construed in the light most favorable to the plaintiff, and the facts as alleged must be accepted as true." Id. (citations omitted).

30.     Here, with respect to the fraudulent transfer and preference claims, the Complaint to be filed alleges, among other things, that the transfers constitute fraudulent and/or preferential transfers under §§ 547, 548 and 549 of the Bankruptcy Code. The allegations are based on the exhaustive investigation conducted by the Committee and its professionals, and, among other things, the Debtor's (and its Affiliates and principals') own tax returns, bank statements, consolidated financial statements, real estate sale contracts and related HUD-1's and deeds, emails, and transcripts and admissions from the Rule 2004 Examinations of Jim, Beverly Magdule, and Jay Goodman.

12

55468/0001-14553969v2

Case 1:16-bk-02022-RNO    Doc 737    Filed 07/19/17    Entered 07/19/17 17:14:43    Desc
Main Document    Page 12 of 16

31.     Once determining that the claims are colorable, the Court should "weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis" to determine whether the prosecution of claims is likely to benefit the estate. In re iPCS, Inc., 297 B.R. at 291 (internal quotation and citations omitted); see also Adelphia, 330 B.R. at 386 (considering whether the "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost"); In re Nat'l Forge Co., 326 B.R. at 548-49 (performing a cost-benefit analysis to determine whether the estate would likely benefit if the claims were pursued); In re Racing Services, Inc., 540 F.3d at 901 (explaining that among the factors courts consider in conducting a cost-benefit analysis are "(1) '[the] probabilities of legal success and financial recovery in the event of success'; (2) the creditor's proposed fee arrangement; and (3) 'the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'") (quoting In re STN Enters., 779 F.2d at 905-06). The purpose of such a cost-benefit analysis is to ensure that any benefit to the estate will justify any delay and expense to the bankruptcy estate from the initiation and continuation of litigation. See In re iPCS, Inc., 297 B.R. at 291 (citation omitted).

32.     The Committee's prosecution of the avoidance actions may have a significant effect on the Debtor's estate by increasing the amount of recovery for unsecured creditors. The Committee believes that the potentially avoidable transfers exceed $35 million, and that certain parcels of real estate, and cash, can be recovered from the transferees. As of the date of this Motion, the estate has only has approximately $10,000 in it for distribution.

33.     Any projected costs of the proposed litigation are dwarfed by the potential recoveries to be obtained through prosecution of the claims. Furthermore, the claims do not present novel issues of law and, as the Adelphia Court noted in a case also involving potentially large recoveries, the cost-benefit analysis "is, to be blunt about it, an easy one." Adelphia, 330

13

B.R. at 384 (noting that the potential recoveries would be enormous and that the cost of prosecution would be relatively modest, as compared to the amount at stake). The decision should be no more difficult here.

34. Thus, a cost-benefit analysis reveals that pursuit of the claims, which the Committee sufficiently asserted in the attached Complaint, are likely to benefit the Debtor's estate and justify any expense or delay that may be incurred through litigation. See, e.g., In re STN Enters., 779 F.3d at 905-06 (explaining that "the court need not undertake a mini-trial" but need only "assure itself that there is a sufficient likelihood of success" to justify any anticipated expense and delay of litigation).

C. **The Debtor Has Unjustifiably Failed and Refused to Assert the Claims**

35. Derivative standing is generally granted where a debtor unjustifiably or unreasonably refuses to pursue claims that the bankruptcy court finds would benefit the estate. See, e.g., Cybergenics, 330 F.3d at 561 (internal citation omitted); see also In re Racing Services, Inc., 540 F.3d at 902 (explaining that creditors have a greater burden to establish derivative standing when a trustee consents than when a trustee unjustifiably refuses to pursue a claim); In re Maxway Corp., 27 F.3d 980, 984 n.1 (4th Cir. 1994) (explaining that committees may be appointed to bring avoidance actions where debtor-in-possession fails to bring an action) (citing 11 U.S.C. 1103(c)(2)). In fact, numerous courts have held that where a colorable claim exists, and the trustee or debtor-in-possession refuses to act, "parties other than the trustee have standing to recover under provisions stipulating that only the trustee may act." Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.), 799 F.2d 91, 93 (3d Cir. 1986) (citation omitted). Moreover, courts have explained that "[t]he rule that individual creditors cannot act in lieu of the trustee is often breached when sufficient reason exists to permit the breach." Id. at 94.

14
55468/0001-14553969v2

Case 1:16-bk-02022-RNO    Doc 737    Filed 07/19/17    Entered 07/19/17 17:14:43    Desc
Main Document    Page 14 of 16

36. As set forth above, the Committee made a demand that clearly sets forth the grounds for, and viability of, the claims, which if successful, will yield a substantial recovery for the benefit of unsecured creditors. The Debtor unjustifiably and/or unreasonably refused to pursue claims that would benefit the estate. In fact, the Debtor and Halberts failed to even provide a basis for their refusal, instead feigning ignorance, delaying the inevitable for many months, and requiring the Committee's professionals to unearth the scheme at great cost to the estate.

37. The Debtor's failure to commence the appropriate avoidance actions has jeopardized the assets, which will likely be depleted or resold to good faith buyers in the very near future, justifying the granting of this Motion.

**D.    The Committee Is Seeking Prior Court Approval to Prosecute the Claims**

38. The third factor this Court should consider is whether the Committee has sought Court approval prior to asserting claims on behalf of the Debtor's estate. That factor is satisfied by the filing of this Motion.

**NOTICE**

39. Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) counsel for the Debtor; (c) potential avoidance action defendants; and (c) those persons who have formally appeared in the Chapter 11 case and requested service pursuant to Rule 2002. In light of the nature of the relief requested, no further notice of this Motion is required.

WHEREFORE, the Committee respectfully requests that the Court enter an Order: (a) granting this Motion; (b) authorizing the Committee to assert the fraudulent transfer, preference, postpetition transfer and other claims on behalf of the Debtor's estate, and (c) granting the Committee such other and further relief as is just and proper.

Dated: July 19, 2017

Respectfully submitted

**COLE SCHOTZ P.C.**

/s/ *Gary H. Leibowitz*
Gary H. Leibowitz
300 East Lombard Street, Suite 1450
Baltimore, Maryland 21202
410-528-2971 (Phone)
410-528-9401 (Facsimile)
**gleibowitz@coleschotz.com**

- and -

Jill B. Bienstock
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
201-525-6328 (Phone)
201-678-6328 (Facsimile)
**jbienstock@coleschotz.com**

*Attorneys for the Official Committee of Unsecured Creditors*

16
55468/0001-14553969v2

Case 1:16-bk-02022-RNO    Doc 737    Filed 07/19/17    Entered 07/19/17 17:14:43    Desc
Main Document    Page 16 of 16